IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

RACHAEL C. SNIDER,

               Plaintiff,

    vs.

UNION PACIFIC RAILROAD COMPANY, a
Delaware corporation;

               Defendant.

**8:24CV356**

**MEMORANDUM AND ORDER**

This is a case under the Federal Employers' Liability Act ("FELA") to recover damages for personal injuries Plaintiff alleges she sustained during the scope of her employment working as a conductor for the Defendant railroad. It comes before the Court on Plaintiff's motion to exclude expert testimony, Filing No. 87, and motion for partial summary judgment, Filing No. 89. For the reasons set forth herein, the Court grants in part the motion to exclude expert witness and denies the motion for partial summary judgment.

## I.    BACKGROUND

### A. Plaintiff's Fall

On September 29, 2021, Plaintiff, Rachael Snider, was working as a conductor for Defendant, Union Pacific Railroad Company ("Union Pacific"), near Gillette, Wyoming, alongside engineer Terry Peterman on Locomotive UP 8122. Filing No. 12 at 2; Filing No. 93-8 at 1. The weather was sunny, but it was also wet from melted snow and ice. Filing No. 93-9 at 10, 14, 21. Snider entered the cab of the locomotive and made sure she had enough air set for the brakes while Peterman went to the rear of the train to inspect the rear locomotive. Filing No. 93-9 at 13–14; Filing No. 93-10 at 22–23. Snider

1

had untied the hand brakes on the cars and returned to the cab of the locomotive when she decided she needed to use the restroom. Filing No. 93-9 at 14. While attempting to descend the stairs of the cab to go to the restroom, Snider fell. *Id.* at 15. Her version of events is as follows:

> So I had come in the back door, and I was wearing my yellow coat that I always have and my ear plugs and my glasses and all of that stuff, and I was like, oh, I need to go to the bathroom.
>
> So I took my coat off and took my glasses and ear plugs out and set all that stuff down and grabbed my group pack and get that stuff all ready, and then I would have started down the stairs, which I definitely did, and then I slid on that little lip thing right on the edge of the top, and honestly, I probably could have cut [sic] myself if there was some of that skid paper that they originally have on the steps, but those steps, they didn't have any left. It had all been shredded by everybody's cleats and use and wear and age, so I just went right down to the bottom, ended up in a really crumpled up pile all cattywampus laying next to the toilet door.

*Id.* Snider claims she immediately felt pain in her rear end and lower back on both sides. *Id.* at 16.

The parties agree that the stairs of the cab on Locomotive UP 8122 had worn grip tape, Filing No. 93-1 (photograph of the stairs)); Filing No. 93-2 (same); Filing No. 93-3 (same), though they disagree whether that played a role in Snider's fall. *Compare* Filing No. 90 at 3 (Plaintiff's statement of facts), *with* Filing No. 100 at 7 (Defendant's statement of facts); *see also* Filing No. 93-9 at 19 (Snider testifying that her wet boots and the lack of grip tape may have played a role in her fall).

After her fall, Snider was able to get up and use the restroom and complete the trip that day. Filing No. 93-9 at 16. That evening, she texted Craig Ford, a manager of road operations for Defendant. Filing No. 93-17 at 7. Ford and Snider had known each other for approximately fifteen years and exchanged regular text messages. *Id.* at 16. Ford

2

was not Snider's supervisor at the time of her fall. *Id.* at 17. Snider wrote to Ford, "Hey I have a serious pi question for you. I slid down the steps and want to talk to someone knowing both sides before i risk turning it in." Filing No. 101-2 at 12. Thereafter, Ford and Snider talked by phone. Filing No. 93-7 at 18. Ford asked if Snider was ok and she replied that "her butt hurt." *Id.*

The next day Snider texted Ford that she felt better, and also wrote, "Well i also realized that terry would be fired too." and "Does it detect bluetooth or just phone signals," apparently in reference to the electronics-monitoring capability of the locomotive. *Id.* at 13.

Snider initially continued to work in her conductor role but reported experiencing increasing pain in her left leg. Filing No. 93-3 at 17. On October 20, 2021, Snider completed Union Pacific Form 52032, "Report of Personal Injury or Occupational Illness." Filing No. 93-22 at 1. She described the injury as "slid down stairs" and the cause as "non slip on stairs missing/wet shoes." *Id.* She reported the fall caused "pain" which she initially thought was a pulled muscle but which had not gone away. *Id.*

By the time Snider filed her Form 52032 reporting her personal injury, the video footage from the cab had been erased in the normal course of business. Filing No. 101-6 at 17–18. Snider went on a medical leave of absence from October 2021 to May 2023. Filing No. 93-9 at 26–27.

Snider filed suit under the FELA on September 10, 2024. Filing No. 1. She alleged one count of negligence per se/strict liability for violation of the Locomotive Inspection Act and one count of negligence and breach of duty under the FELA. Filing No. 1 at 3–4. She sought damages for pain and suffering, medical expenses, loss of earnings and

earning capacity, loss of enjoyment of life, and permanent injury and disability. Filing No. 1 at 4. Union Pacific asserted several affirmative defenses including, as relevant here, that Plaintiff's negligence was the sole cause of her injury, that Plaintiff was comparatively and/or contributorily negligent, and that Plaintiff had failed to mitigate her damages. Filing No. 16 at 4.

**B. Expert Witnesses**

Union Pacific has offered the testimony of Dr. Jeffrey Broker. Dr. Broker holds a Ph.D. from the University of California at Los Angeles in Biomechanics and Motor Control. He is an associate professor of biomechanics at the University of Colorado at Colorado Springs, the owner of the consulting firm Echelon Biomechanics, and an advisor in sport biomechanics to the United States Olympic Committee. Filing No. 88-3 at 1. He has published dozens of articles, books, chapters, and review articles, and testified as an expert witness in other FELA cases. *Id.* at 3–13. Dr. Broker is not a medical doctor. Filing No. 88-5 at 6.

Dr. Broker provided an expert report on Snider's fall. Filing No. 88-2. He opined that "[t]he biomechanics of stair descent do not support slipping as a probable or reasonable mechanism" because "[w]hen a lead foot is properly placed on a tread—particularly while wearing required railroad footwear—the risk of slipping is low." *Id.* at 2. Instead, he concluded, that "it is more probable that, if Ms. Snider fell, she overstepped a tread or a nosing" rather than slipped. *Id.* He opined that stair maintenance was not a factor because "the treads were not excessively worn." *Id.* at 3. He also noted that Snider may have contributed to the fall because she may have been carrying an object at the time and therefore failed to use the handholds provided. *Id.* Lastly, he opined that her

4

preexisting degenerative lumbar spine condition was the likely explanation for her pain, not the fall. *Id.*

Dr. Broker relied on numerous documents to form his opinion, including Snider's medical and employment records, deposition transcripts, and photographs. Filing No. 88-2 at 1–2. Dr. Broker admitted that in forming his initial opinion and drafting his report, he relied on a set of photographs that were not taken near the time of the incident. Filing No. 88-5 at 15. The photographs upon which Dr. Broker relied were taken years later and showed significantly more anti-slip material on the steps than actually existed on the date of the Snider's fall, the material presumably having been replaced at some point between Snider's fall and the present litigation. *Id.* However, Dr. Broker testified that after reviewing the correct photographs, his opinion did not change, although he acknowledged "that misrepresentation carried through a bit into the supplemental report" in terms of his description of the condition of the stairs. *Id.*

Snider presented a rebuttal report authorized by Dr. Mariusz Ziejewski. Filing No. 88-4. Dr. Ziejewski holds a Ph.D. in engineering from North Dakota State University and has been a professor of impact biomechanics for over forty years. Filing No. 88-6. He has served as a consultant for various governmental agencies on human body dynamics, including the National Highway Traffic Safety Administration, the U.S. Air Force, and the Department of Defense, and has authored numerous publications in the field. *Id.* at 1, 13–20.

Dr. Ziejewski reviewed Dr. Broker's report and concluded it was incorrect for several reasons, including that he had relied on photos depicting incorrect tread conditions on the stairs; he did not perform a biomechanical slip analysis; he did not

5

measure the coefficient of friction and only measured the stair geometry; he mis-framed the issue as a choice between overstepping or slipping when both could be contributing factors; and he offered opinions on Snider's injuries without supporting them with biomechanical injury analysis. Filing No. 88-4 at 1–7.

Dr. Broker submitted two supplemental reports. Filing No. 98-1; Filing No. 98-2. He authored the first supplemental report after inspecting UP locomotive 8122 in person. Filing No. 98-1 at 1. He reported that his in-person inspection supported his initial conclusions, primarily that Snider overstepped a tread due to failing to use handholds. *Id.* at 2–3. In his second supplemental report, Broker admitted that his initial and first supplemental reports had relied on inaccurate photographs of the stairs that depicted more slip-resistant material on the steps than had existed at the time of the fall. Filing No. 98-2 at 3. However, he maintained this mistake was immaterial and did not change his overall conclusions because "the condition of these steps . . . is irrelevant to the cause of the fall" since he had concluded Snider had overstepped at the top of the stairs. *Id.*

Snider now moves to exclude Dr. Broker's testimony and for partial summary judgment on the question of liability.

## II.    STANDARDS OF REVIEW

### A. Standard for Motion to Exclude Witnesses

Federal Rule of Evidence 702 governs the admissibility of expert testimony and requires that: (1) the evidence must be based on scientific, technical or other specialized knowledge that is useful to the finder of fact in deciding the ultimate issue of fact; (2) the witness must have sufficient expertise to assist the trier of fact; and (3) the evidence must be reliable or trustworthy. *Kudabeck v. Kroger Co.*, 338 F.3d 856, 859 (8th Cir. 2003).

When faced with a proffer of expert testimony, trial judges are charged with the "gatekeeping" responsibility of ensuring that all expert evidence admitted is both relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). The proponent of expert testimony bears the burden of providing admissibility by a preponderance of the evidence. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).

"[C]ases are legion" in the Eighth Circuit that "call for the liberal admission of expert testimony." *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014). "As long as the expert's scientific testimony rests upon 'good grounds, based on what is known' it should be tested by the adversary process with competing expert testimony and cross–examination, rather than excluded by the court at the outset." *Id.* (quoting *Daubert*, 509 U.S. at 590). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (quoting *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 976 (8th Cir. 1995)).

District courts are "not to weigh or assess the correctness of competing expert opinions." *Id.* The jury, not the trial court, should be the one to "decide among the conflicting views of different experts." *Kumho Tire Co.*, 526 U.S. at 153.

## B. Standard for Summary Judgment

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that "an adverse party cannot produce admissible evidence to support" a fact essential to the nonmoving party's claim. Fed. R. Civ. P. 56(c)(1)(A) & (B). The plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"The movant 'bears the initial responsibility of informing the district court of the basis for its motion, and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex Corp.*, 477 U.S. at 323). If the movant does so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324). A "genuine" issue of material fact exists "when there is sufficient evidence favoring the party opposing the motion for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

8

The evidence must be viewed in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *Kenney v. Swift Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003). "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations." *Id.* "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Koehn v. Indian Hills Cmty. Coll.*, 371 F.3d 394, 396 (8th Cir. 2004). If "reasonable minds could differ as to the import of the evidence," summary judgment should not be granted. *Anderson*, 477 U.S. at 251.

## III.    PLAINTIFF'S MOTION TO EXCLUDE EXPERT WITNESS

Snider moves to exclude Dr. Broker's testimony on the basis that he is unqualified and utilizes an unreliable methodology.

### A. Qualifications

Snider argues Dr. Broker is not qualified to testify as an expert witness in this case because his expertise is in a different field, he unduly encroaches on medical opinions, he improperly criticizes Snider's credibility, and he improperly opines on Union Pacific's internal rules.

The Court finds Dr. Broker is qualified to provide his biomechanical analysis. He has a Ph.D. in biomechanics and motor control and has extensive experience, including in publishing and testifying, on topics in that field. However, to the extent Dr. Broker attempts to offer expert testimony on medical topics, like the nature of Snider's preexisting back injury and its likely role in her current pain, he is unqualified to do so. He has no medical expertise and may only opine on matters relating to biomechanics. Likewise, Dr. Broker is not qualified to opine on Snider's credibility, such as implying she is

exaggerating her symptoms or misrepresenting when they began. *See Engesser v. Dooley*, 457 F.3d 731, 736 (8th Cir. 2006) ("An expert may not opine on another witness's credibility.").

Lastly, Union Pacific agrees that Dr. Broker cannot opine on or analyze Union Pacific's internal rules, such as regarding handholds on stairs. The Court agrees that Dr. Broker is not qualified as an expert in railroad rule interpretation and may discuss Union Pacific's rules only as necessary to provide context to the biomechanical aspects of his analysis. Accordingly, Snider's motion to exclude Dr. Broker's testimony based on his not being qualified as an expert is granted in part and denied in part.

## B. Reliability

Snider next argues Dr. Broker's opinions are unreliable because he based them on inaccurate photographs of the stairs in question, he did not conduct any biomechanical testing, and his method is not scientific.

To satisfy the reliability requirement of the *Daubert* test, the party offering the expert testimony must show by a preponderance of the evidence "that the methodology underlying [the expert's] conclusions is scientifically valid." *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010) (citations omitted). In making the reliability determination, the court may consider:

> (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operations; and (4) whether the theory or technique is generally accepted in the scientific community.

*Russell v. Whirlpool Corp.*, 702 F.3d 450, 456 (8th Cir. 2012). Additional factors to consider include: "whether the expertise was developed for litigation or naturally flowed

10

from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008) (quoting *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 448–49 (8th Cir. 2008)).

"This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject" these factors as the particular case demands. *Russell*, 702 F.3d at 456 (citation omitted). When making the reliability inquiry, the court should focus on "principles and methodology, not on the conclusions that they generate." *Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012). However, "conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Snider's critiques of Dr. Broker's analysis are well-taken. Importantly, Dr. Broker himself admitted that in two of his three reports, he relied on inaccurate photographic depictions of the stairs in question that showed significantly more anti-slip material on the steps than existed at the time of the accident. However, he claimed that this error did not change his ultimate conclusion that Snider was responsible for the fall due to overstepping, not due to slipping on the step regardless of how much anti-slip material was worn away. Ultimately, Dr. Broker's mistaken reliance on inaccurate photographs as well as Snider's other critiques about the lack of hands-on testing Dr. Broker performed go to credibility, not admissibility. Dr. Broker adequately explained the scientific basis for his methods as being rooted in biomechanics such that the Court is convinced he employed a sufficiently reliable methodology. Snider will be free to criticize his methods and explore his purported mistakes on cross-examination, and her own expert will be able

11

to explain why he believes the additional testing he conducted resulted in a better analysis that Dr. Broker's.  The Court declines to exclude Dr. Broker's testimony in its entirety.

## IV.    PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Snider moves for summary judgment on the question of FELA liability because she claims the undisputed facts show Union Pacific violated the Locomotive Inspection Act and said violation caused her injury.  Snider does not move for summary judgment on the amount of damages.  She also moves for sanctions against Union Pacific for failing to preserve the video evidence from the day of her fall.  Lastly, Snider moves for summary judgment on Union Pacific's affirmative defenses of contributory negligence, sole cause of the incident, and failure to mitigate damages.

FELA provides the exclusive remedy for a railroad employee injured as a result, in whole or in part, of his or her employer's negligence.  45 U.S.C. § 51; *Wabash R. Co. v. Hayes*, 234 U.S. 86, 89 (1914).  Substantively, FELA actions are governed by federal law. *Norfolk Southern Ry. Co. v. Sorrell*, 549 U.S. 158, 165 (2007).   "Under the FELA, '[a] railroad will be liable if its or its agent's negligence played any part, *even the slightest*, in producing the employee's injury.'"  *Miller v. Union Pac. R.R. Co.*, 972 F.3d 979, 984 (8th Cir. 2020) (emphasis in original) (quoting *Ybarra v. Burlington N., Inc.*, 689 F.2d 147, 149 (8th Cir. 1982)).  "FELA's language on causation . . . 'is as broad as could be framed.'" *Id.* (quoting *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 691 (2011)).  "Moreover, a violation of a safety statute 'creates liability under FELA . . . without regard to whether the injury flowing from the breach was the injury the statute sought to prevent.'"  *Id.* (quoting *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 433 (1958)).  "Thus, 'a railroad's violation of a safety statute . . . is negligence per se.'"  *Id.* (quoting *McBride*, 564 U.S. at 703 n.12).

Snider premises her claim of FELA per se negligence on Union Pacific's violation of the Locomotive Inspection Act.

The Locomotive Inspection Act ("LIA") provides, as relevant here, that "[a] railroad carrier may use or allow to be used a locomotive . . . only when the locomotive . . . and its parts and appurtenances . . . are in proper condition and safe to operate without unnecessary danger of personal injury." 49 U.S.C. § 20701(1). "The LIA has the 'purpose and effect of facilitating employee recover[y]' by conferring on railroads a 'duty to provide safe equipment.'" *BNSF Ry. Co. v. Seats, Inc.*, 900 F.3d 545, 546 (8th Cir. 2018) (alteration in original) (quoting *Urie v. Thompson*, 337 U.S. 163, 188–89 (1949)). Snider alleges Union Pacific violated the LIA and its implementing regulation at 49 C.F.R. § 229.119(c) which provides, "Floors of cabs, passageways, and compartments shall be kept free from oil, water, waste or any obstruction that creates a slipping, tripping or fire hazard. Floors shall be properly treated to provide secure footing." Union Pacific disputes both that it violated the LIA and that any violation was the cause, even in part, of Snider's injuries.

### A. Spoliation of Evidence

As a preliminary matter, Snider moves for sanctions against Union Pacific for spoliation of evidence due to its purported failure to preserve video evidence from the cab on the day of her injury despite her informing Ford of the injury the same day. She argues the Court should impose the sanction of finding duty, breach, and causation admitted, and precluding a defense of contributory negligence because of the spoliation.

Federal courts possess the inherent authority to sanction "conduct which abuses the judicial process." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017)

(quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991)).  That includes the ability to sanction parties for spoliating or failing to preserve evidence.  *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 280 (8th Cir. 1995).  In order to find spoliation of the evidence such as would warrant sanctions, (1) "there must be a finding of intentional destruction indicating a desire to suppress the truth," and (2) "[t]here must be a finding of prejudice to the opposing party."  *Hallmark Cards, Inc. v. Murley*, 703 F.3d 456, 460 (8th Cir. 2013).

Snider has not met her burden to demonstrate that Union Pacific failed to preserve the video evidence intentionally and with a desire to suppress the truth.  The evidence shows Snider did not report the injury to her immediate supervisor, but instead separately texted Ford, with whom she appears to have had a personal friendship.  Importantly, Snider specifically told Ford that she did *not* want to report the injury to Union Pacific. Instead, she was seeking Ford's advice on whether Union Pacific would be able to monitor electronic device usage at the time she slipped because she didn't want to get herself or her coworker in trouble.  While Snider may be correct that Ford, as a manager, should have nevertheless breached Snider's confidence and told the company about her injury, in the context of the friendship and her express request that he not disclose the injury, the Court cannot conclude that Union Pacific acted with the requisite intention to suppress the truth.  Accordingly, the Court will not impose sanctions on Union Pacific for spoliation of evidence.

**B. Violation of the LIA**

Snider argues Union Pacific should be deemed to have committed negligence per se because the undisputed evidence show it violated the LIA.  Disputes of material fact

14

prevent the Court from concluding Union Pacific violated a safety statute as a matter of law.

Snider argues the exposed metal on the stair means the locomotive was not "in proper condition," 49 U.S.C. § 20701(1), because Union Pacific failed to ensure that "[f]loors [were] properly treated to provide secure footing," 49 C.F.R. § 229.119(c). However, the evidence is disputed as to whether the metal stairs with worn grip tape constitute "properly treated" floors which provided "secure footing."

Importantly, the regulation upon which Snider relies does not require or mention grip tape, nor does it define "properly treated" as it relates to stairs or metal flooring. *See* 49 C.F.R. § 229.119(c). Snider argues that "properly treated" must be construed to mean "with intact anti-slip material." She points to testimony from UP employees who agreed that steps should have grip paper. *See, e.g.,* Filing No. 93-11 at 15 (Union Pacific mechanic and inspector Robert Redenius testifying that steps with a worn surface like those of the 8122 locomotive were a "safety hazard"). Meanwhile, Union Pacific points to other of its employees who opined that missing grip tape is common and not a safety issue, and not a defect which would require taking the train out of service for maintenance. *See* Filing No. 93-17 at 10 (Ford testifying that not all engines have grip tape and "[i]t's something that you wouldn't look for"); Filing No. 93-25 at 14 (Engineer Helmer Pedersen testifying that missing non-slip surface was a "fairly common" condition). Because the regulation is silent and there is conflicting evidence, the factfinder will need to determine whether the condition of the stairs at the time of Snider's injury constituted "properly treated" flooring to provide "secure footing" or not. Accordingly, Snider's motion for summary judgment on this basis is denied.

15

### C. Cause of Snider's Injuries

Snider also seeks summary judgment on the basis that Union Pacific's violation of the LIA was the cause, in full or in part, of her injuries. First, this motion must be denied because the Court cannot determine that there was a violation of the LIA as a matter of law as set forth in the previous section. Second, however, even if the Court were able to say Union Pacific violated the LIA as a matter of law, there are disputed material facts as to the extent to which the condition of the flooring contributed in part or in full to Snider's injuries.

Snider's credibility is at issue. According to Snider, she slipped while descending the stairs because of the lack of anti-slip material. However, Snider's actions immediately after her injury could cast doubt on the veracity of her account. Her texts to Ford evince an intent to conceal her own wrongdoing, including potentially using an electronic device in contravention of railroad rules at the time of the fall. Additionally, Dr. Broker opined on the ways in which Snider's injury could have been the result of an overstep due to Snider being distracted, carrying an object, or failing to use handholds, rather than the condition of the stair itself. Accordingly, the jury will need to determine which version of events it finds most credible in assessing whether Union Pacific's LIA violation, if any, contributed to Snider's injury and to what degree. Accordingly, Snider's motion for summary judgment on this element of her FELA claim is denied.

### D. Affirmative Defenses

Snider argues she is entitled to summary judgment on Union Pacific's affirmative defenses of contributory negligence, sole cause, and failure to mitigate damages.

In FELA actions, "the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee." 45 U.S.C. § 53. However, "[i]f the plaintiff's negligence was the sole cause, then the violation of the [safety statute] could not have contributed in whole or in part to the injury." *Beimert v. Burlington N., Inc.*, 726 F.2d 412, 414 (8th Cir. 1984).

Disputes of material fact preclude summary judgment on any of Union Pacific's affirmative defenses. As to contributory negligence and sole cause, there is evidence by which the jury could find Snider was using an electronic device at the time of her fall or carrying an object or that she failed to use handholds. In particular, she initially did not want to disclose the injury to Union Pacific because she feared discipline for her and her coworker's prohibited use of devices. Thus, it will be for the factfinder to determine if Snider's version of her fall is truthful or if there was some other contributory or sole cause of her injury. The Court cannot rule on these questions as a matter of law.

As to Union Pacific's failure to mitigate defense, there are disputed facts over the extent to which Snider is able to work and attempted to find alternative work.

"[P]roof of the failure to mitigate damages for loss of future earning capacity limits the damages to the difference the plaintiff would have earned in his previous position with the railroad and what he might have earned in another position." *Bissett v. Burlington N. R. Co.*, 969 F.2d 727, 731 (8th Cir. 1992) (citing *Jones v. Consol. Rail Corp.*, 800 F.2d 590, 594 (6th Cir. 1986)).

Snider argues that her treating physician's determination that she cannot return to her job should decisively preclude Union Pacific's mitigation defense. Union Pacific, by

17

contrast, argues that Plaintiff could secure alternative employment because she still possesses her engineering license and seniority as an engineer. Filing No. 93-9 at 33. According to Kimberlee Foye, Union Pacific's senior vocational case manager, Snider has not availed herself of Union Pacific's return-to-work procedures, such as exploring alternative placement opportunities within the company. Filing No. 93-27 at 9–11. This is sufficient for Union Pacific to meet its burden of production at the summary judgment stage; it will be for the jury to determine whether Snider has failed to mitigate her damages.

## V.    CONCLUSION

For the reasons stated herein, the Court will grant Plaintiff's motion to exclude portions of Dr. Broker's testimony but will allow him to testify to matters within his area of expertise. The Court will deny Plaintif's motion for partial summary judgment as to FELA liability and Defendant's affirmative defenses. Accordingly,

IT IS ORDERED:

1. Plaintiff's Motion to Exclude, Filing No. 87, is granted in part and denied in part as stated herein.

2. Plaintiff's Motion for Partial Summary Judgment, Filing No. 89, is denied.

Dated this 10th day of July, 2026.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge

18